RHESA HAWKINS BARKSDALE, Circuit Judge,
concurring in part and dissenting in part.
The majority’s long-overdue opinion (oral argument was held over two years ago, on 3 December 2012), reviews cross-motions for summary judgment. I concur, of course, in the majority’s holding that the substantive-due-process claim by Taylor Bell’s mother is waived and that qualified immunity precludes liability against the superintendent and principal in their individual capacities, leaving at issue only Bell’s First Amendment claim against the school board. Maj. Opm. at 282 n. 1. I must dissent, however, from the majority’s both vacating the summary judgment for the school board on that claim and rendering summary judgment for Bell on it. (Assuming arguendo the school board is not entitled to summary judgment, Bell is not entitled to it either.) Regarding the First Amendment claim, except for the intentionally published threats to, and harassment and intimidation of, two teachers, which the school board found justified disciplinary action against Bell, I will not take issue with the majority’s categorizing at 299, in note 46, the miniscule balance of Bell’s incredibly violent, vulgar, and profane rap recording as involving “a matter of public concern”.
“With the advent of the Internet and in the wake of school shootings at Columbine, Santee, Newtown and many others, school administrators face the daunting task of evaluating potential threats of violence and keeping their students safe without impinging on their constitutional rights.” Wynar v. Douglas Cnty. Sch. Dist., 728 F.3d 1062, 1064 (9th Cir.2013). In that regard, school administrators must be afforded wide latitude in proactively addressing language that reasonably could be interpreted as a threat, harassment, or intimidation against members of the school community.
“Experience shows that schools can be places of special danger.” Morse v. Frederick, 551 U.S. 393, 424, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007) (Alito, J., concurring). For example, 11 days after oral argument in our court for this appeal on 3 December 2012, a 16-year-old entered Sandy Hook Elementary School, in New-town, Connecticut, and shot and killed 20 school children and six staff members, including the principal, before killing himself. In the two years since the Sandy Hook shooting, in the United States there have been 93 school shootings (defined as instances of the discharge of a firearm on campus) and 40 major school shootings (defined as an incident where the shooter was linked to the school and at least one person was shot on campus), including the most recent incidents at Florida State University, where a former student opened fire on students in the library, and at Marysville-Pilchuck High School outside Seattle, Washington, where a student killed four fellow students, before killing himself. Greg Botelho, Faith Karimi, & Nick Valencia, Gunman opens fire in Florida State University library; 3 wounded, CNN, 21 Nov. 2014, available at http://www.cnn.com/2014/ll/20/us/fsu-incident/; Faith Karimi & Joe Sutton, Jfth Victim dies after shooting at high school cafeteria in Washington state, CNN, 8 Nov. 2014, available at http://www.cnn. com/2014/11/08/us/washington-school-shooting/index.html; Matt Kreamer, 2 dead, U wounded in shooting at Marys-ville-Pilchuck High School, The Seattle Times, 24 Oct. 2014, available at http:// *306 blogs.seattletimes.com/today/2014/10/ shooting-reported-at-Marysville-pilchuck-high-school/; School Shootings in America Since Sandy Hook, We Are Everytown for Gun Safety (3 Dec. 2014), http://everytown. org/article/sehoolshootings/; see also Spinning Statistics on School Shootings, FactCheck.org (25 June 2014), http://www. factcheek.org/2014/06/spinning-statistics-on-school-shootings/.
Tragically, this post-oral-argument school-related violence is consistent with the increasing school-related violence prior to the date of oral argument here. From 19 February 1997 (the day a 16-year old shot and killed a student and principal, and injured two others in Bethel, Alaska) to the date the school board found against Bell on 7 February 2011, there were 171 school shootings (including those in Pearl, Mississippi, Littleton, Colorado (Columbine), and Blacksburg, Virginia (Virginia Tech)). Major School Shootings in the United States Since 1997, Brady Campaign to Prevent Gun Violence (17 Dec. 2012), http://gunviolence.issuelab.org/ resource/major_schooLschootings-in_the_ United_States_since_1997. , For example, on 6 February 2011, the day before the school-board meeting concerning Bell, one student was killed and 11 others were injured during a shooting at Youngstown State University in Ohio. Id.
As evidence of this disturbing trend of school violence, each State in our circuit has passed legislation addressing such violence since the Sandy Hook shooting. See Nathan Koppel, More Texas Schools Allow Armed Employees, Wall Street Journal, 25 Aug. 2014, available at http://online.wsj. com/articles/more-texas-schools-allow-armed-employees-140 8986620. Louisiana has passed legislation changing/expanding emergency preparedness drills; Mississippi and Texas have passed legislation allowing the addition of school police or security officers; and Texas has also passed legislation allowing certain personnel to carry firearms on school grounds, and authorizing state-funded school safety centers. Id. Symptomatic of how commonplace violence at schools has become, six States “mandate active shooter drills for schools,” designed to simulate mass shooting situations, while 24 States “requir[e] general school lockdown or safety drills”. Dan Frosch, Active Shooter’ Drills Spark Raft of Legal Complaints, Wall Street Journal, 4 Sept. 2014, available at http://online.wsj. com/articles/active-shooter-drills-spark-raft-of-legalcomplaints-1409760255.
Meanwhile, nearly all teenagers use the Internet, with the majority of them accessing it and social-networking websites through mobile devices. Amanda Lenhart, Presentation, PewResearch Internet Project, Teens & Technology: Understanding the Digital Landscape (25 Feb. 2014), http://www.pewinternet.org/2014/02/25/ teens-technology-understanding-the-d igi-tal-landscape/ (explaining 95 percent of teenagers use the Internet and 74 percent of teenagers between 12 and 17 years old are mobile Internet users); see also Amanda Lenhart, Presentation PewResearch Internet Project, It Ain’t Heavy, It’s My Smartphone: American Teens & The Infiltration Of Mobility Into Their Computing Lives (14 June 2012), http://www. pewinternet.org/2012/06/14/it-aint-heavy-its-my-smartphone-american-teens-and-the-infiltration-of-mobility-into-their-computing-lives/ (explaining, as of 2012, 80 percent of teenagers used social-networking websites). Commonly used social-media websites include Facebook (provides a litany of social services such as “news feed”, personalized “profile” and instant-messaging), Twitter (allows users to “tweet” statements up to 140 characters, and view others’ “tweets”, in personalized feed), Instagram (allows users to post, and view others’, pictures, in personalized *307 feed), Snapchat (allows users to send personalized pictures to others while limiting time users may view an image), and Pin-terest (allows users to post and group pictures or webpages to their profile). As a result of this “near-constant student access to social networking sites on and off campus, when offensive and malicious speech is directed at school officials and disseminated online to the student body, it is reasonable” for school officials to foresee a substantial disruption to the school environment. J.S. ex rel. Snyder v. Blue Mountain Sch. Dist., 650 F.3d 915, 950 (3d Cir.2011) (Fisher, J., dissenting).
“[A] page of history is worth a volume of logic”. N.Y. Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 65 L.Ed. 963 (1921) (Holmes, J.); see also Oliver Wendell Holmes, Jr., The Common Law 5 (1881) (“The life of the law has not been logic: it has been experience.”). In the light of such use of social media by students and the oft-repeated school violence before and after the school board’s finding against Bell, school administrators must remain vigilant as they seek to prevent violence against students and faculty. As part of this vigilance, they must take seriously any statements by students resembling threats of violence, as well as intimidation and harassment by them. Long ago, Justice Jackson warned: “There is danger that, if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact”. Terminiello v. City of Chicago, 337 U.S. 1, 37, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Jackson, J., dissenting). That warning applies to the result-driven majority opinion.
Throughout its opinion, the majority attempts to camouflage Bell’s threats, intimidation, and harassment under the guise of “rap music”. For this red herring, in classifying Bell as an “aspiring rap musician”, e.g., at 282, 301, 301, and note 21 at 285, the majority hopes characterizations and euphemistic descriptions will distract from the patent seriousness of Bell’s aggressive and dangerous comments. Whether Bell was “rapping”, singing country music, or reading poetry is immaterial; he threatened, intimidated, and harassed two teachers. At issue is the message, not the medium'.
Regrettably, although the majority pays lip service to the increasing danger in schools, it then sanctions the threats, harassment, and intimidation in the rap recording, including by turning its back on the deference that must be accorded school administrators in dealing with such serious matters. Among other threatening, harassing, and intimidating statements, Bell’s rap recording includes: “I’m going to hit you with my [Rjueger [sic]” (referring to a firearm manufactured by Sturm, Ruger & Co.), “going to get a pistol down your mouth /Boww” (or “Pow”), and “middle fingers up if you want to cap that nigga” (“cap” is slang for “shoot”). To hold, as the majority does, that these and similar statements in the rap recording are protected speech is beyond comprehension. With due deference, the majority’s holding is absurd. This cannot be the law.
I.
A correct recitation of the underlying facts, from the summary-judgment record, is especially important for this appeal. The majority opinion fails in that regard. For example, it often states that Bell “testified”, without specifying whether it was during the disciplinary-committee hearing (at which his informal comments were not under oath) or at the hearing on his request for a preliminary injunction. E.g., Maj. Op. at 282, 285, 286, and in note 3 at 282.
*308 Bell posted the rap recording on 5 January 2011 to his public Facebook page, using what appears to be a representation of a Native American as the rap recording’s cover image.' (The Itawamba Agricultural High School mascot is a Native American.) A screenshot of Bell’s Facebook profile, taken approximately 16 hours after he posted the rap recording, shows his profile, including the rap recording, was open to, and viewable by, the public. In other words, anyone could access and listen to the rap recording.
Additionally, although the majority claims at 285, in note 21, that there is no evidence identifying Bell’s Facebook “friends”, or whether any attended his school, when viewing a person’s profile, Facebook shows ten randomly selected friends. In this instance, three of those friends were self-identified members of the Itawamba school district.
The following school day, on 6 January, Coach W. received a text message from his wife, asking about the rap recording; she had learned about it from a friend. The coach listened to the rap recording at school, using a student’s cellular telephone, which had access to the Internet. The coach immediately reported the rap recording to the school’s principal,. Wiygul, who then informed McNeece, the school-district superintendent.
On 7 January, Wiygul, McNeece, and Floyd (the school-board attorney) questioned Bell about the rap recording and its accusations, after which Bell was sent home for the remainder of the day. Because of snow days, the school was closed through 13 January.
During his time away from school, and to give far wider dissemination of his rap recording, Bell created a finalized version of it (adding commentary and a picture slideshow), and uploaded it to YouTube, again making the rap recording available to the public.
Bell returned to school on 14 January, but was removed from class midday by the assistant principal and told he was suspended, pending a disciplinary-committee hearing (school officials permitted him to remain in the school commons until the school bus he rode arrived at the end of the day). By letter that same day to Bell’s mother, the school-district superintendent (McNeece) informed her a hearing would be held on 19 January to consider disciplinary action for Bell’s “alleged threatening intimidation and/or harassment of one or more school teachers”. In the letter, McNeece explained Bell’s suspension would continue until further notification, and informed his mother of the possible actions the school board could take.
In an 18 January telephone conversation with the school-board attorney, Bell’s mother requested Bell’s hearing be continued until 26 January. The school-board attorney re-set the hearing for the requested date.
The disciplinary-committee hearing was held 26 January. Although there is no transcript of the hearing, the recording of it is included in the summary-judgment record. The information contained in the disciplinary-committee-hearing recording more than justified the subsequent action taken by the school board. The disciplinary-committee-hearing recording is the critical evidence at hand, making it necessary to describe the contained information in great detail.
The hearing was facilitated by Floyd, the school-board attorney; three disciplinary-committee members were present, as well as the principal, Bell, his mother, and their attorney. The school-board attorney began by addressing the informal nature of the hearing. And, throughout the hearing, the school-board attorney emphasized *309 the issue before the committee was whether Bell threatened, harassed, and/or intimidated school personnel and whether he should be disciplined as a result. The school-board attorney explained that the allegations against the two coaches would be the subject of another proceeding. (The majority fails at 287, in note 25, to include this explanation in its discussion of Bell’s attorney’s attempting, at the disciplinary-committee hearing, to inject students’ allegations against the coaches.)
Wiygul, the principal, stated: Coach W. came into his office, explaining “several kids” were talking about a rap recording Bell had posted on Facebook, which was derogatory toward him and another coach, and accused them of inappropriate conduct; the following morning, Bell was brought into a meeting and asked about his accusations, but would not talk about them; at that time, school officials decided it was best to send Bell home for the remainder of the day; and Bell came to school the next school day (which, due to snow, was the following Friday), but the assistant principal told him to leave as he was suspended pending a hearing.
After Wiygul spoke, the YouTube version of the rap recording was played at the hearing.
Bell and his mother then stated that he was .not told of the suspension until Friday (14 January), when the assistant principal saw Bell and contacted McNeece, the school-district superintendent, asking her what to do about Bell’s presence. According to them, McNeece first instructed the assistant principal that Bell could stay, but then instructed him to tell Bell to leave and not come back.
Bell’s attorney then began asking who decided on the temporary suspension and the reason for that decision. Floyd, the school-board attorney, redirected the discussion, explaining the purpose of the hearing was to determine whether the suspension should be upheld, and whether the allegations that Bell threatened, harassed, and intimidated teachers were correct.
One of the committee members asked Bell if he had spoken to anyone at the school about the accusations he made in the rap recording. Bell explained he did not speak to anyone about those accusations, but instead made the rap recording because he knew people were “gonna listen to it, somebody’s gonna listen to it”. (Several times during the hearing Bell acknowledged he posted the rap recording to Facebook because he knew it would be viewed and heard by students. Moreover, he explained that at least 2,000 people contacted him about the rap recording in response to the Facebook and YouTube postings.)
Although Bell’s attorney tried to begin discussing the misconduct of the coaches alleged in the rap recording, the school-board attorney again redirected the conversation to the purpose of the hearing, which was, as she explained, to discuss the “comments made ... the ‘you’ve f — ed with the wrong one / going to get a pistol down your mouth / POW [because] those are threats to a teacher”.
Bell responded by stating, ‘Well that ain’t really what I said”, and then provided what he described as the “original copy”. (It is unclear from the disciplinary-committee-hearing recording, or other parts of the summary-judgment record, which copy of the rap item Bell provided. There are three written versions of the rap item in the record. The first was submitted as an exhibit by the school board with its response in opposition to Bell’s motion for a preliminary injunction and used the word “ruler”, instead of “rueger [sic]”, following “I’m going to hit you with my ... ”. The other two versions were exhibits intro- *310 dueed at the preliminary-injunction hearing. The second version was submitted by Bell and used the word “rueger [sic]”. The third version is hand-written excerpts, submitted by the school board. During the preliminary-injunction hearing, the school board stipulated to the accuracy of Bell’s transcription. Finally, the “rueger [sic]” and “ruler” versions were both resubmitted as exhibits with the cross-motions for summary judgment. The “rueger [sic]” version was submitted with Bell’s motion for summary judgment as an exhibit, and the “ruler” version was submitted with the school-board’s motion.)
Bell explained he did not mean he was going to shoot anyone, but that he was only “foreshadowing something that might happen”. Nevertheless, Bell acknowledged that “certain statements” were made to his mother that “‘put a pistol down your mouth’U that is a direct threat”. Floyd, the school-board attorney, clarified for the record, and the mother agreed, that no one at the hearing made those statements to Bell’s mother. Rather, those statements were made “outside the school setting”.
One of the committee members asked Bell why he had posted a new version of the rap recording on YouTube after school officials had approached him about his posting the rap recording on Facebook. Bell gave a few (and somewhat conflicting) explanations: the version he posted on Facebook was a raw copy, so he wanted a finalized version posted on YouTube; the Facebook version was posted for his friends and “people locally” to hear, whereas the YouTube version was for music labels to hear; and he posted the YouTube version with a slideshow of pictures to help better explain what the rap recording was about because people had been asking him about it (the Facebook version only included a brief explanation of the backstory in the caption to the rap recording).
Near the end of the disciplinary-committee hearing, Bell explained again that: he put the rap recording on Facebook and YouTube knowing it was open to public viewing; part of his motivation was to “increase awareness of the situation”; and, although he did not think the coaches would hear the rap recording and did not intend the rap recording to be a threat, he knew students would listen to the rap recording, later stating “students all have Facebook”.
Throughout the hearing, the school-board attorney and committee members were very considerate toward Bell and counseled him on what appropriate action he could have taken. (Amazingly, one member even told Bell that he “really can rap” and explained there would have been no problem with the rap recording or its vulgar language if it had not included threats against school employees. The majority claims at 288, in note 29, that this committee member did not characterize Bell’s statements as “threatening”, and only admonished Bell for his word choice, “thus providing Bell poetic or artistic advice”. Given that the disciplinary committee found Bell harassed and intimidated the coaches, while finding it was vague whether he threatened them, this distinction by the majority is wide of the mark. It is consistent with the majority’s going to any extreme to avoid the obvious: that Bell threatened, intimidated, and harassed two teachers.) At the close of the disciplinary-committee hearing, the school-board attorney emphasized, and Bell’s attorney did not contest, that by posting the rap recording to an open Facebook page, Bell knew anyone could hear the rap recording.
By 27 January letter to Bell’s mother, the school-board attorney advised: the dis *311 ciplinary committee had determined “the issue of whether or not lyrics published by Taylor Bell constituted threats to school district teachers was vague”, but that the publication of the rap recording constituted harassment and intimidation of two teachers, in violation of school-board policy and state law; as a result, the disciplinary committee recommended Bell’s seven-day suspension be upheld and that he be placed in the county’s alternative school for the remainder of the nine-week grading period; Bell would not be “allowed to attend any school functions and [would] be subject to all rules imposed by the Alternative School”; and “[he would] be given time to make up any work missed while suspended or otherwise receive a 0, pursuant to Board policy”.
By 1 February letter, the school-board attorney confirmed to Bell’s attorney the content of their 31 January conversation, during which Bell’s attorney had stated: Bell wished to appeal the disciplinary-committee’s recommendation; and Bell and his mother were expected to appear before the board on 7 February without counsel, because their attorney was unable to attend due to a scheduling conflict. The letter advised that, despite the recommendation that Bell begin alternative school on 27 January, he had not attended any classes and explained these absences would add to the length of time before he would be allowed to return to a regular classroom.
The only document in the record from the 7 February school-board meeting is the minutes of that meeting. They state: “Chairman Tony Wallace entertained a motion by Clara Brown to accept the discipline recommendation of the discipline committee regarding student with MSIS #000252815 (I.A.H.S.) and finding that this student threatened, harassed and intimidated school employees. Wes Pitts seconded the motion. Motion Carried Unanimously.” Subsequently, at the 10 March preliminary-injunction hearing, the school-board attorney testified that, at the 7 February school-board meeting, the board listened to a recitation of Bell’s rap item.
The majority at 289, note 32, states the “record is unclear regarding the exact evidence presented to the School Board”, but that the “Board’s decision apparently was based on the same audio-recording of Bell’s song heard by the Disciplinary Committee”. The record is not “unclear”. During the preliminary injunction hearing, the school-district’s attorney asked McNeece, the school-district superintendent, “[T]he two lyrics that I’ve read into the record and these witnesses have read into the record, were presented to the school board, correct?”, to which McNeece replied, “That’s correct.” Portions of the rap item read into the record include: “[G]oing to get a pistol down your mouth” and “Middle fingers up, if you want to cap that nigga”. Therefore, it is not unclear what the school board considered. Furthermore, at the beginning of the preliminary-injunction hearing, Bell’s attorney submitted as evidence the transcription of the rap item. As discussed supra, at that hearing, the school board accepted this transcription as “the correct version”.
By 11 February letter to Bell’s mother, the school-board attorney explained that, contrary to the earlier-described lesser findings of the disciplinary committee (Bell had harassed and intimidated two teachers; but, whether he had made a threat was “vague”), the school board had determined: “Bell did threaten, harass and intimidate school employees in violation of School Board policy and Mississippi State Law”. (According to the written school .policy, “[h]arassment, intimidation, or threatening other students and/or teachers” constitutes a “severe disruption”.) *312 Notwithstanding the school board’s determining Bell had engaged in conduct even more serious than that found by the disciplinary committee, the school board upheld the recommendations of the disciplinary committee.
On 24 February, Bell and his mother filed this action, claiming the school board, superintendent, and principal, inter alia, violated Bell’s First Amendment rights. Plaintiffs moved for a preliminary injunction on 2 March, seeking Bell’s immediate reinstatement to his high school, including the reinstatement of “all privileges to which he was and may be. entitled as if no disciplinary action had been imposed”, and that all references to. this incident be expunged from his school records.
For the earlier-referenced 10 March hearing on the preliminary-injunction request, Bell included four affidavits from students at his school, containing allegations against the coaches. (The affidavits were not considered by the district court during’the preliminary-injunction hearing.)
At the hearing, the superintendent testified that she had attended the school-board meeting at which Bell’s rap item was presented; and that there was a foreseeable danger of substantial disruption at the school as a result of the rap recording.
Both coaches accused and threatened in the rap recording testified at the preliminary-injunction hearing; each explained the rap recording affected their work at the school. Coach R. testified that, subsequent to the publication of the rap recording, students began spending more time in the gym, despite teachers telling them to remain in classrooms; and Coach W. testified that he interpreted the words in the rap recording literally and was frightened. (The majority at 295-96, in note 41, disputes the nature of the testimony by claim-, ing the only evidence of a substantial disruption was the coaches’ alteration of their teaching styles “to avoid any appearance of impropriety”, and, at 302, seeks to diminish the importance of the testimony by stating Coach W. “did not indicate whether he actually feared Bell, rather than the possibility that one of the female students’ family members might harm him in light of the song’s revelations”. This is incorrect. For example, as the majority admits at 289-90, Coach W. testified that, in addition to being frightened by the rap recording, he did not allow the members of the school basketball team he coached to leave after games until he was in his vehicle. Moreover, Coach W.’s testimony provides valuable insight into how an objectively reasonable person would interpret the threats in the recording.) At the hearing, the district court refused to entertain questioning on whether the allegations against the two coaches were true. After finding Bell’s last day of alternative school would be the next day, 11 March, the district court ruled the issue was moot and denied the preliminary injunction.
On cross-motions for summary judgment, the district court denied Bell’s motion and granted defendants’ (the school board, superintendent, and principal). In doing so, it ruled the rap recording constituted “harassment and intimidation of teachers and possible threats against teachers and threatened, harassed, and intimidated school employees”. Bell v. Itawamba Cnty. Sch. Bd., No. 1-11-CV-56, 859 F.Supp.2d 834, order at 9 (N.D. Miss. 15 Mar. 2012). The court also held the rap recording “in fact caused a material and/or substantial disruption at school and ... it was reasonably foreseeable to school officials the song would cause such a disruption”. Id. Moreover, the court held: (1) the individual defendants were entitled to qualified immunity; and (2) Bell’s mother could not show a violation of her Fourteenth Amendment rights. Id. at 12.
*313 II.
As discussed above, the majority affirms these last two holdings. I dissent only from its (1) vacating the summary judgment granted the school board on Bell’s First Amendment claim and (2) rendering judgment for him on that claim. The judgment awarded the school board on the First Amendment claim should be affirmed. In the alternative, that claim should be remanded to district court for trial.
A summary judgment is reviewed de novo, applying the same standard as did the district court. E.g., Feist v. La., Dep’t of Justice, Office of the Att’y Gen., 730 F.3d 450, 452 (5th Cir.2013) (citation omitted). Summary judgment is proper when “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law”. Fed. R.Civ.P. 56(a). “A genuine dispute of fact exists when evidence is sufficient for a reasonable jury to return a verdict for the non-moving party, and a fact is material if it might affect the outcome of the suit.” Willis v. Cleco Corp., 749 F.3d 314, 317 (5th Cir.2014) (internal citation and quotation marks omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
In determining whether to grant summary judgment, the court, in its de novo review, views the evidence in the light most favorable to -the non-movant. E.g., Dameware Dev., LLC v. Am. Gen. Life Ins. Co., 688 F.3d 203, 206-07 (5th Cir.2012) (citation omitted). Consistent with that, when, as here, cross-motions for summary judgment are in play, “we review [de novo ] each party’s motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party”. Cooley v. Hous. Auth. of Slidell, 747 F.3d 295, 298 (5th Cir.2014) (internal quotation marks omitted) (quoting Ford Motor Co. v. Tex. Dep’t of Transp., 264 F.3d 493, 498 (5th Cir.2001)). “Although on summary judgment the record is reviewed de novo, this court ... will not consider evidence ... not presented to the district court”, but “we may affirm the ... decision on any basis presented to the district court”. Am. Family Life Assur. Co. of Columbus v. Biles, 714 F.3d 887, 896 (5th Cir.2013) (citations and internal quotation marks omitted).
The summary-judgment record at hand includes, inter alia: (1) affidavits of four students regarding the coaches’ supposed conduct; (2) screenshots of Bell’s Face-book page; (3) a transcription of the rap item submitted by the school board (“ruler” version); (4) a transcription of the rap item submitted by Bell (“rueger [sic]” version); (5) the letter from the superintendent to Bell’s mother informing the Bells of a hearing before the disciplinary committee; (6) the digital recording of the rap recording; (7) the first screenshot of Bell’s Facebook “wall”; (8) the second screen-shot of Bell’s Facebook “wall”; (9) the disciplinary-committee’s findings; (10) the disciplinary-committee-hearing minutes and the all-important CD recording of that hearing; (11) the school-board attorney’s letter to Bell’s mother informing her of the disciplinary-committee’s findings; (12) the school-board-hearing minutes; (13) the school-district discipline policy; (14) the school-board attorney’s letter to Bell’s mother informing her of the school-board’s determination; and (15) the transcript of the preliminary-injunction hearing.
For obvious reasons, in analyzing school-board decisions, deference must be accorded the school-board’s determinations. Callahan v. Price, 505 F.2d 83, 87 (5th Cir.1974); see also Wood v. Strickland, 420 U.S. 308, 326, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) (“It is not the role of the federal courts to set aside decisions of school ad *314 ministrators which the court may view as lacking a basis in wisdom or compassion.”); overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Shanley v. Northeast Indep. Sch. Dist., 462 F.2d 960, 967 (5th Cir.1972) (citing cases) (“That courts should not interfere with the day-to-day operations of schools is a platitudinous but eminently sound maxim which this court has reaffirmed on many occasions.”).
A.
It is well-established that students do not forfeit their First Amendment rights to freedom of speech and expression when they enter school. Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The First Amendment does not, however, guarantee students absolute rights to such freedoms. As Justice Oliver Wendell Holmes, Jr., wrote nearly a century ago: “[T]he character of every act depends upon the circumstances in which it is done. The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.” Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (citation omitted). Bell’s rap recording, through which the school board found he threatened, intimidated, and harassed two members of the faculty at his high school, was intentionally disseminated through Facebook and YouTube. Accordingly, on two bases (true threat and substantial disruption), the threatening, harassing, and intimidating portions of Bell’s incredibly violent, vulgar, and profane rap recording do not enjoy the protection of the First Amendment.
1.
The school-board’s decision should be upheld under the “true threat” analysis originally introduced in Watts v. United States, 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Although the First Amendment generally protects speech, “the government can proscribe a true threat of violence without offending the First Amendment”. Porter v. Ascension Parish Sch. Bd., 393 F.3d 608, 616 (5th Cir.2004). “[A] prohibition on true threats ‘protect[s] individuals from the fear of violence’ and ‘from the disruption that fear engenders,’ in addition to protecting people ‘from the possibility that the threatened violence will occur’ ”. Virginia v. Black, 538 U.S. 343, 360, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (alteration in original) (quoting R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)). “Speech is a true threat and therefore unprotected if an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm.” Porter, 393 F.3d at 616 (citation and internal quotation marks omitted). Moreover, intimidation is a form of true threat. See Black, 538 U.S. at 360, 123 S.Ct. 1536 (“Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.”).
The true-threat analysis was further explained in Doe v. Pulaski County Special School District, which provided a two-step test: (1) whether the speaker “intentionally or knowingly communicated the statement in question to someone” including “a third party”; and (2) “whether a reasonable person would interpret the purported threat as a serious expression of an intent to cause a present or future harm”. 306 F.3d 616, 622, 624 (8th Cir.2002) (en banc). Our court affirmatively cited Doe as an “illustrative application” of the true-threat *315 test in the context of school speech. Porter, 393 F.3d at 616-18 (finding off-campus speech at issue not intentionally communicated to anyone). In our de novo review of the cross-motions for summary judgment, the question then becomes whether, pursuant to the standard set by Rule 56(a), each prong of the two-step test is satisfied.
a.
Regarding the first step, and contrary to the position taken by the majority, there is no genuine dispute that Bell intentionally and knowingly communicated the rap recording in a way that it would reach the school. Bell first posted the rap recording to his open Facebook account, accessible to anyone with a Facebook account, and not limited to his Facebook 1,380-member “friend” group. At the disciplinary-committee hearing, he stated he knew “students and stuff would hear it because ... students all have Facebook”. And, Bell posted a revised version of the rap recording to YouTube, which offers unlimited access. When asked at the disciplinary-committee hearing why he did not discuss his allegations with the school principal, he stated that such conversations would have no impact, but “[i]f I do the song, they’re going to listen to it”. It is undisputed that Bell intentionally targeted the rap recording to students and administrators alike, hoping the latter would take action after hearing the recording.
b.
The next question in this two-step analysis is whether a reasonable person would view the threatening speech as “an intent to cause a present or future threat”. Doe, 306 F.3d at 622. This is an issue of law. See generally id. at 616-26 (rendering judgment as a matter of law, holding as objectively reasonable the determination that the threat constituted a “true threat”).
As stated, there can be no question that an objectively reasonable person would interpret the rap recording as a true threat. When a student intentionally and publicly states that an educator will be “capped” (shot), have a pistol put down his mouth, and hit with a pistol, an objectively reasonable school administrator may interpret these words to constitute a true threat. “School administrators must be permitted to react quickly and decisively to address a threat of physical violence ... without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance.” Ponce v. Socorro Indep. Sch. Dist., 508 F.3d 765, 772 (5th Cir.2007).
Supporting how an objectively reasonable person would view the comments, Coach W. testified at the preliminary-injunction hearing that he took the rap recording “literally”, felt “scared”, reported the rap recording to the principal immediately upon hearing it, and took extra safety measures after liearing the rap recording. Consistent with that testimony, Bell’s expert witness in the field of rapping testified at the preliminary-injunction hearing that, if a rap item names an individual directly preceding a threat, “it would definitely be cause for conversation with the [rapper], absolutely”. And, as discussed earlier, Bell’s mother even received comments from community members (outside the school setting) who had heard the rap recording and believed the language about putting a pistol down someone’s mouth would constitute a direct threat. After listening to the statements in the rap recording, the school board determined unanimously “that [Bell] did threaten, harass, and intimidate school employees”. Therefore, the rap recording was understood, both subjectively by one of the *316 coaches and objectively by the school board, to be a threat.
Bell implores this court to interpret his threats as simply artistic expression. The majority, likewise, contends at 300 and 301 that, because Bell’s threats were embedded in some protected speech, his threats were, at worst hyperbolic or metaphoric and that such speech does not constitute a true threat. But the nature of the speech and Bell’s own admissions belie this contention. As discussed supra, in the written version of the rap recording relied upon by Bell, he threatened, inter alia, to “hit [a coach] with my rueger [sic]”, referring, as noted supra, to the firearms manufacturer Sturm, Ruger & Co. (Emphasis added.) In the YouTube version, Bell also stated he was writing about “real-life experience”. By his own admission, then, not all of the rap recording was meant to be rhetorical; instead, Bell urges only the portions involving . threats, harassment, and intimidation fit that category.
Regardless, under the true-threat analysis, whether Bell intended the rap recording to be taken as a threat is immaterial. Porter, 393 F.3d at 616. The same is true for whether he was capable of carrying out the threat. Id. at 616 n. 25 (discussing Doe’s instruction to disregard subjective ability to carry out threat). The school board determined unanimously that the rap recording threatened, harassed, and intimidated the coaches. Accordingly, Bell was suspended for Offense 16 (threatening, harassing, and intimidating) of the severe-disruptions section of the school-district disciplinary policy, and in violation of state law. (Two potential state-law examples, among many, are Mississippi Code Annotated § 37-11-21 (making it a misdemean- or to abuse teachers) and § 97-45-17 (making it a felony to post messages through electronic media for the purpose of causing an injury to another).)
Incredibly, the majority seems to believe that making such threats in a rap recording obscures the fact that Bell’s words could reasonably be considered to place two members of the school’s faculty in danger, and that taking disciplinary action against him for such conduct violates his First Amendment rights. But, again, “rapping” has nothing to do with this; a student who speaks the words Bell spoke, regardless of the manner of speech, threatens teachers. The majority at 286-87, and in note 27, urges that, by Bell’s stating he was writing about real-life, he was referring to his personal experiences at school regarding the allegations about the coaches, and that his “real-life” statement should not be construed to imply a serious intent to carry out the threats in his recording. Again, the public-school system “relies.necessarily upon the discretion and judgment of school administrators and school board members”. Wood, 420 U.S. at 326, 95 S.Ct. 992. Therefore, as noted supra, “[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion”. Id.; see also Morse, 551 U.S. at 425, 127 S.Ct. 2618 (Alito, J., concurring) (“[D]ue to the special features of the school environment, school officials must have greater authority to intervene before speech leads to violence”.).
The majority at 302, in note 49, emphasizes that, based on numerous factors such as the claimed indirect and allegedly conditional nature of the threat, and the claimed lack of evidence demonstrating a violent predisposition, Bell’s speech could not have been considered a true threat as a matter of law. The question is not which interpretation is more reasonable; rather, it is whether an objectively reasonable person *317 could interpret the speech as a true threat. (Along that line, and as the summary-judgment evidence demonstrates, Coach W., the school board, and other members in the community who contacted Bell’s mother understood the speech to be a threat.)
The majority at 303, in note 50, accuses this dissent of failing to give “due consideration to the consequences on social and political discourse” by this dissent’s labeling Bell’s speech a “true threat”. The majority equates Bell’s threats to other forms of pure political speech and, relying on the facts of Watts, claims Bell’s speech could not have reasonably been interpreted as a true threat. (At 300-01, in an absurd metaphor, the majority claims that no reasonable person would conclude performers murdered, or intended to murder, the characters in their well-known songs based on their lyrics. Needless to say, those songs involved fictional characters, not real-life educators during an extremely tragic period of school violence in this Nation’s history. This comparison by the majority conveys an attitude that not only ignores this tragic period but also reflects an almost callous indifference toward it.)
Further, the majority glosses over the stark differences between this case and Watts. In Watts, at a Vietnam War protest rally, the speaker made, for effect, hyperbolic “threats” against the President, stating, “If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.” 394 U.S. at 706, 89 S.Ct. 1399. Here, unlike in Watts, and according to his rap recording, Bell knew these coaches, and interacted with, and had access to, them as a student. Additionally, Bell did not speak abstractly; rather, he advocated their being killed with a specific brand of gun, and in a specific way. Bell’s access to the coaches, and the specificity with which he threatened, intimidated, and harassed them, mandate an outcome different from that reached by the majority. As discussed, the First Amendment must give way in the face of speech reasonably interpreted as imminent threats of danger.
Finally, this court should be even more reluctant to overrule the judgment of school officials in the light of the above-described, widespread gun violence throughout our Nation. Combining Bell’s intentional communication of the rap recording toward students and administrators with the school board’s objective determination that Bell threatened, harassed, and intimidated two teachers, there is no genuine dispute that Bell’s threats satisfy the true-threat test and, therefore, are unprotected speech.
2.
In the alternative, and pursuant to the Tinker “substantial-disruption” test, the school-board’s decision did not violate Bell’s First Amendment rights. In general, our court applies the Tinker analysis to “school regulations directed at specific student viewpoints”. Porter, 393 F.3d at 615; see also Wynar, 728 F.3d at 1069 (“[W]hen faced with an identifiable threat of school violence, schools may take disciplinary action in response to off-campus speech that meets the requirements of Tinker.”); Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist., 494 F.3d 34, 38 (2d Cir.2007); Boim v. Fulton Cnty. Sch. Dist., 494 F.3d 978, 982-83 (11th Cir.2007) (analyzing threats of violence to individual teachers under Tinker). Tinker allows a school board to discipline a student for speech that either causes a substantial disruption or is reasonably forecast to cause one. 393 U.S. at 514, 89 S.Ct. 733. In that regard, as discussed, judicial review is necessarily deferential: “School administrators must be permitted to react quickly and decisively to address a threat of physi *318 cal violence ... without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance”. Ponce, 508 F.3d at 772.
The majority contends the rap recording is “off-campus” speech, noting throughout its recitation of the facts that, inter alia, Bell composed, recorded, and uploaded the recording off-campus. Even assuming the “on-campus/off-campus” distinction remains relevant today (it does not, as discussed infra), Bell’s intent for the speech to reach members of the community (admitted by Bell at the disciplinary-committee hearing and recognized by the majority at 283), evinced by his posting the recording publicly to Facebook and YouTube, makes Bell’s speech the functional equivalent of on-campus speech. Treating it otherwise is a classic, and forbidden, elevation of form over substance.
Notwithstanding its assuming the Tinker test applies in this instance, the majority claims at 293-94, in notes 37 and 38, that our precedent only leaves open the possibility of applying Tinker to off-campus speech. But, contrary to the majority’s understanding, this is not an open issue: our court has applied Tinker to off-campus speech when, as in this instance, the speech reached the school. In a post-Tinker decision, Sullivan v. Houston Independent School District, our court held that, where a student sold vulgar newspapers off-campus, defendant’s “conduct ... outweigh[ed] his claim of First Amendment protection”. 475 F.2d 1071, 1075 (5th Cir.1973) (“This case arises from the unauthorized distribution of an underground newspaper near a high school campus, and presents the now-familiar clash between claims of First Amendment protection on the one hand and the interests of school boards in maintaining an atmosphere in the public schools conducive to learning, on the other.” (emphasis added)). Our court reasoned: “In the years since Tinker was decided courts have refused to accord constitutional protection to the actions of students who blatantly and deliberately flout school regulations and defy school authorities”, proceeding to cite numerous cases applying Tinker to similar speech. Id. at 1076. Although the court was careful to emphasize the reasonable responses of the school and the unhelpful conduct by defendant in the face of such responses, the court also emphasized defendant’s “conduct [could] hardly be characterized as the pristine, passive acts of protest ‘akin to pure speech’ involved in Tinker”. Id. (citation omitted).
Likewise, the contrast here could not be greater. Bell’s rap recording is so far removed from the armbands worn in Tinker, protesting the war in Vietnam, that his seeking protection under the First Amendment, based on the test in Tinker, borders on being frivolous. Consistent with Justice Black’s warning in Tinker, the majority’s allowing Bell to threaten, intimidate, and harass two teachers, by holding the comments are protected speech, signals a “revolutionary era of permissiveness in this country fostered by the judiciary”. Tinker, 393 U.S. at 518, 89 S.Ct. 733 (Black, J., dissenting).
Further, our court’s decision in 2004 in Porter supports this conclusion. The Porter court, in noting other circuits’ application of Tinker to off-campus activities, interpreted Sullivan as applying Tinker to off-campus speech. 393 F.3d at 615 n. 22, 619 n. 40 (stating “a number of courts have applied the test in Tinker when analyzing off-campus speech brought onto the school campus”, citing Sullivan).
The majority at 295, in note 39, accuses this dissent of “patently] misreading” Sullivan and Porter. In a footnote devoid of any relevant legal analysis, the majority *319 not only intentionally ignores Sullivan’s reliance on Tinker in reaching its conclusion, but implies the court made an ad hoc decision. By determining the school’s pri- or-approval regulation was constitutional, the Sullivan court concluded that Tinker applies to off-campus speech; the court could not have reached its conclusion without applying Tinker to the off-campus speech. 475 F.2d at 1076-77. The majority’s assertions that our court has not previously applied Tinker to off-campus speech is an egregious misrepresentation of our precedent.
Furthermore, the majority at 297-99 erroneously reads Ponce as limiting the application of Tinker in the school context to Columbine-like situations. Ponce is only one of our court’s decisions applying Tinker. The distinction espoused by the majority ignores the paramount consideration that any threat, harassment, and intimidation of a teacher in a school environment must be taken seriously. Limiting an administrator’s ability to act on threats in only Columbine-like, mass-shooting circumstances is a recipe for disaster.
But, even assuming our court has not previously applied Tinker to off-campus speech, in the light of the facts underlying this appeal, technological developments, as discussed supra, have rendered the distinction obsolete. The pervasive and omnipresent nature of the Internet, in many respects, has obfuscated the “on-campus/off-campus” distinction read into Tinker by some courts. Accord Layshock ex rel. Layshock v. Hermitage Sch. Dist., 650 F.3d 205, 220-21 (3d Cir.2011) (Jordan, J., concurring) (“For better or worse, wireless internet access, smart phones, tablet computers, [and] social networking ... give an omnipresence to speech that makes any effort to trace First Amendment boundaries along the physical boundaries of a school campus a recipe for serious problems in our public schools.”). With students having instant access to the Internet anywhere, drawing such an arbitrary distinction both tortures logic and ignores history.
Skirting the issue, the majority at 293-94, in note 37, advocates that, despite rapidly changing technology, school administrators are powerless to act absent specific Supreme Court guidance. Once again, this flies in the face of the absolute necessity for school officials to act promptly to protect their students and teachers against threats, harassment, and intimidation. To keep pace with technological developments, “speech” made over the Internet (whether through an on-campus or off-campus computer) that is intentionally directed at the school cannot be ignored based solely on the original source. The majority disagrees, citing Morse, 551 U.S. at 424, 127 S.Ct. 2618 (Alito, J., concurring), for the proposition that “[i]t is a dangerous fiction to pretend that parents simply delegate their authority — including their authority to determine what their children may say and hear — to public school authorities”, and Shanley, 462 F.2d at 964, for the proposition that a school board’s unreasonable “assumption of authority is an unconstitutional usurpation of the First Amendment”. Obviously, these general principles do not conflict with the issue at hand.
Here, Bell targeted his rap recording at the school by posting it on Facebook and YouTube, admittedly knowing students, and admittedly hoping administrators, would listen to it. The majority states at 295 that the school’s prohibition of student cell phones on-campus made it unlikely the recording would be heard on-eampus. This assertion is not supported by the summary-judgment record. For example, in one instance, the rap recording reached *320 the school through a student cell phone. Although Bell stated at the disciplinary-committee hearing that he never encouraged anyone at school to listen to the rap recording, he also stated he knew students would listen to it, and that part of his motivation was to “increase awareness of the situation”. Therefore, Tinker applies. The majority’s merely assuming that it does apply detracts from the very important considerations at play in this appeal.
Under Tinker, “school officials may regulate student speech when they can demonstrate that such speech would substantially interfere with the work of the school or impinge upon the rights of other students”. Porter, 393 F.3d at 615 (citation and quotation marks omitted). This standard can be satisfied by either showing a disruption has occurred, or by showing “demonstrable factors that would give rise to any reasonable forecast by the school administration of ‘substantial and material’ disruption”. Shanley, 462 F.2d at 974 (citation omitted).
Taking the school board’s decision into account, and the deference we must accord it, the issue to be decided is whether a genuine dispute of material fact exists for whether the school board acted reasonably in finding Bell’s rap recording constituted an ongoing, or reasonably foreseeable, substantial disruption. Because the school district’s written policy embraces the Tinker analysis, this question boils down to whether the school board acted reasonably in determining the rap recording was a substantial disruption because it threatened, harassed, and intimidated two teachers. There is no genuine dispute of material fact; the school board acted reasonably.
The school-district’s Discipline — Administrative Policy lists the offense “Harassment, intimidation, or threatening other students and/or teachers” as a “severe disruption”. That policy establishes conduct that the school board considers sufficient to satisfy Tinker’s substantial-disruption test. Along that line, the superintendent testified at the preliminary-injunction hearing that her initial decision to suspend Bell stemmed from her belief the rap recording constituted a danger of a substantial disruption at the school. In that regard, threats against, and harassment and intimidation of, teachers are inherently disruptive. Finally, as Bell admitted, and the majority recognizes at 287, even assuming arguendo Bell’s speech was not an imminent threat, the speech reflected the possibility of future violence by others. This, alone, resolves the issue of whether it was reasonably foreseeable to disrupt the school.
Relying on language in Shanley stating school boards cannot rely on ipse dixit to demonstrate material and substantial interference with school discipline, the majority makes several logical missteps. It asserts at 294 that this dissent’s Tinker analysis relies too heavily on the school board’s interpretation that “threatening, intimidating and harassing” speech constitutes a “severe disruption”. Again, regarding teachers, what else could such speech constitute? Under the majority’s understanding of Tinker, a student could say anything so long as he set it to melody or rhyme. Once again, the majority refuses to acknowledge reality.
As the majority notes at 296-97, Shanley also states: “Tinker requires that presumably protected conduct by high school students cannot be prohibited by the school unless there are ‘facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities ....’” 462 F.2d at 970 (citing Tinker, 393 U.S. at 514, 89 S.Ct. 733). As stated, *321 threats against, and intimidation and harassment of, teachers by their very nature reasonably “forecast substantial disruption”, regardless of whether an actual disruption occurs. Finally,’the majority intentionally limits its discussion to the “threatening” aspects of Bell’s speech, ignoring its “intimidating” and “harassing” aspects. Perhaps it does so because the broader terms of “intimidation” and “harassment” necessarily require less strenuous proof. In short, the majority confuses ipse dixit with reality.
Further examination of the rap recording demonstrates this. In addition to the above-discussed threats, intimidation, and harassment in the recording, Bell, for example, refers to the teachers as “perverts”. He even derides the size of the breasts of the wife of one of the teachers (“his wife ain’t got no tittie's”). Those harassing comments alone forecast a substantial disruption to school discipline.'
The majority at 297, in note 43, claims the school board’s disciplinary, policy embraces the majority’s contention that the school may only discipline a student for speech originating physically on-campus because other listed “offenses” relate to on-campus conduct. This assertion is factually and logically incorrect. First, in addition to activities that commonly occur on-campus, the policy lists several prohibited “off-campus” activities, e.g., behavior on a school bus, which likely occurs off school grounds. Second, under this rationale, Bell would be immune from disciplinary action were he to present the rap recording, with its extensive threatening, harassing, and intimidating portions, on television, over the radio, or in a newspaper. As Sullivan makes clear, speech conveyed through the latter media may be restricted. E.g., 475 F.2d at 1076. Finally, this understanding ignores the nature of such comments; even if they are made “off-campus”, the danger and disruptiveness — of the comments do not cease to have effect the moment after being made. Rather, they remain linked to the speaker, and as the speaker comes closer to the subject (such as when the student attends school), the danger becomes more present and the likelihood of disruption increases. Therefore, the majority’s attempt to limit the school board’s policy as applying only to activities physically occurring on school grounds runs counter to the policy’s express language and purpose.
After temporarily suspending Bell and holding two hearings, school officials considered the rap recording substantially disruptive. And, as noted, the school board upheld the recommendation of the disciplinary committee, after the board found Bell’s rap recording constituted a threat, harassment, and intimidation. In doing so, the school board also reasonably forecast further substantial disruption to the school’s mission and school administrators’, responsibility to protect students and faculty. (Significantly, the disciplinary-committee hearing and school-board meeting more than satisfied Bell’s due-process rights. See Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist., 635 F.3d 685, 691-92 (5th Cir.2011) (explaining alternative education program does not violate Fourteenth Amendment and, for temporary suspensions, only “an informal give-and-take-between student and disciplinarian” is required) (emphasis added).)
Citing AM. ex rel McAllum v. Cash, 585 F.3d 214, 221 (5th Cir.2009) for the proposition that school officials “must base their decisions on fact, not intuition”, the majority at 292 intimates that the school board disciplined Bell based on the “mere expectation” of disruption. The summary-judgment record shows otherwise. For example, Bell’s mother testified that members of the community believed the language in *322 the rap recording was threatening; Bell admitted the possibility of violence against the coaches, stating he was “foreshadowing something that might happen”; and, most importantly, Coach W. testified that he would not let members of the basketball team leave the gymnasium until he was in his vehicle, which demonstrates an actual disruption occurred.
Seeking shelter under the First Amendment, Bell makes two meritless claims: his rap recording is merely hyperbole and, therefore, protected speech; and, as a corollary, the school board acted unreasonably.
First, Bell’s claim that the rap recording is not threatening, harassing, or intimidating is immaterial. Under Tinker, a school may take action so long as the speech is reasonably forecast to cause a material and substantial disruption. Shanley, 462 F.2d at 974-75. Here, as discussed supra, it is reasonable to conclude that a material-and-substantial disruption could occur as a result of the statements against the coaches. Possible fact-based substantial disruptions range, for example, from the coaches’ inability to properly teach, resulting from students’ loss of respect for the coach, to acts of violence carried out against the coaches.
Second, Bell’s assertion that the school-board determination was unreasonable is, itself, unreasonable as a matter of law. E.g., Burnham v. Ianni, 119 F.3d 668, 679 (8th Cir.1997). To find Bell’s claim meritorious would require holding no objectively reasonable person could interpret language in Bell’s rap recording as threatening, intimidating, or harassing. Not only does such a conclusion defy common sense, but it also goes against the undisputed evidence, in particular Coach W.’s statement that the language frightened him.
The majority attempts to bolster its untenable position by claiming at 282 that the school board did not demonstrate the rap recording “caused a substantial disruption of school work or discipline, or that school officials forecasted or reasonably could have forecasted such a disruption”. See also Maj. Op. at 294-96 & nn. 38 & 41. The school board is not required to engage in a “substantial disruption” analysis commensurate with that undertaken by courts assessing speech infringement under Tinker; rather, the school board is required to show “demonstrable factors” that would give rise to any reasonable forecast of a substantial disruption. E.g., LaVine v. Blaine Sch. Dist., 257 F.3d 981, 989 (9th Cir.2001); see also, e.g., D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist., 180 Fed.Appx. 232 (2d Cir.2006) (affirming, without supplementation, the district court’s conclusion that Tinker supported the school board’s suspension of a student after finding he had “threatened use and/or contemplated use of a weapon in violation of the Code of Conduct”).
In sum, Tinker-based judicial decisions assessing substantial-disruption speech review the “totality of the relevant facts”, LaVine, 257 F.3d at 989; “Tinker does not prescribe a uniform, ‘one size fits all’ analysis. The [cjourt must consider the content and context of the speech, and the nature of the school’s response”, Lowery v. Euverard, 497 F.3d 584, 588 (6th Cir.2007). “We look not only to [the student’s] actions, but to all of the circumstances confronting the school officials that might reasonably portend disruption”. LaVine, 257 F.3d at 989 (citation omitted).
Generally, Tinker provides school administrators may discipline a student for speech that materially and substantially interferes “with the requirements of appropriate discipline in the operation of the school”. 393 U.S. at 513, 89 S.Ct. 733 *323 (citation and internal quotation marks omitted). Other courts have provided additional factors for evaluating the substan-tiality of a potential disruption. Relevant facts and circumstances may include: whether the infringement arose from a “desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint”; whether the speech identifies an educator “by name, school, or location”; whether a “reasonable person could take its content seriously”; whether “the record clearly demonstrates that” anyone took the speech seriously; how the speech reached the school; and whether the speech “was purposely designed by [the student] to come onto the campus”. Snyder, 650 F.3d at 926, 929, 951 (Smith J., concurring). Additional factors include: whether the speech “directly pertained to events at” the school; the student’s “intent in” engaging in the speech; whether the speech was misleading; the nature and seriousness of the penalty levied on the student; and any in-school disturbances, including administrative disturbances in-' volving the speaker brought about “because of the need to manage” concerns over the speech. Doninger v. Niehoff, 527 F.3d 41, 50-52 (2d Cir.2008).
The totality of the relevant facts are addressed through the lens of the bedrock principle that “the determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts”, and with the understanding that “Tinker does not require certainty that disruption will occur, but rather the existence of facts which might reasonably lead school officials to forecast substantial disruption”. Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267-68, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (citation and internal quotation marks omitted); LaVine, 257 F.3d at 989; see also Lowery, 497 F.3d at 596 (“School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place.”).
Here, Bell presented a transcription of the recording containing the threats and references to guns, and he admitted at the disciplinary-committee hearing that he posted the recording to public websites on the Internet, intending the language to reach both the school community and the public at large. Therefore, not only does the summary-judgment record support the school board’s finding the recording threatened, intimidated, and harassed two coaches, but this conclusion stems from Bell’s own submissions to, and admissions before, the disciplinary committee.
The majority also contends at 285, in note 21,„that there is no evidence indicating how many of Bell’s friends listened to the posted recording. This is irrelevant. Bell admits, and the majority recognizes at 283, that Bell intended the speech to reach the school community, which it did. The majority further contends at 285, in note 21, that the Facebook comments undermine this dissent’s claim that the school board could have forecasted reasonably a substantial disruption. The majority’s logic is flawed; although potentially representative of how some would interpret the recording, simply because one segment of the population views speech one way does not make another understanding objectively unreasonable. This red herring by the majority undermines its position' — -the only issue of consequence is whether the school board acted reasonably in viewing Bell’s speech as “threatening, intimidating, or harassing”, not which interpretation is “more reasonable”.
Further, the majority’s claim ignores that, pursuant to school-district policy, threatening, harassing, and intimidating *324 teachers is a subset of conduct constituting “severe disruptions”. It also fails to recognize that, by finding Bell threatened, harassed, and intimidated the two coaches, the school board implicitly found Bell caused a severe disruption. Given the content of the rap recording, Coach W.’s reaction and communication with school authorities, Bell’s claim that he was speaking about real life, the dissemination of the rap recording with the knowledge students would access it, and the access by at least one student in the presence of Coach W., there is no genuine dispute for whether the school board acted reasonably; it did.
B.
Before this court for de novo review are cross-motions for summary judgment. As discussed supra, each motion must be reviewed independently. Assuming,arguen-do a genuine dispute of material fact exists regarding the school board’s summary-judgment motion, then a genuine dispute of material fact also exists regarding Bell’s summary-judgment motion.
The key factor for reviewing the school-board’s motion is the understandable, and well-established, deference that must be accorded its decision. It goes without saying that no such deference is accorded the First Amendment claim in Bell’s summary-judgment motion. The deference accorded the school board is incorporated in its reliance on true threats and substantial disruption as the independent bases for its decision.
Accordingly, assuming arguendo a genuine dispute of material fact exists regarding that decision by the school board, summary judgment cannot be rendered for Bell on his First Amendment claim. Instead, that claim must be remanded to district court for trial. In other words, assuming arguendo the majority is correct in vacating the summary judgment awarded the school board on Bell’s First Amendment claim, the majority errs, nevertheless, in rendering summary judgment for Bell on that claim.
III.
For the foregoing reasons, for Bell’s First Amendment claim,111 dissent from the majority’s both vacating the summary judgment for the school board and rendering summary judgment for Bell. Instead, the district court’s judgment should be affirmed on all issues. In the alternative, assuming arguendo the school board is not entitled to summary judgment against Bell’s First Amendment claim, the majority cannot render summary judgment for Bell on that claim; it must be remanded to district court for trial.